FILED
2017 Feb-09 PM 08:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **LOUIS W. JONES, SR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **2:16-cv-00400-SGC** |
| **UAB  HEALTH SYSTEM,** | ) | |
| | ) | **ORAL ARGUMENT** |
| **Defendant.** | ) | **REQUESTED** |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Louis Jones, Sr. ("Jones" or "Plaintiff") submits this statement of undisputed facts and Memorandum of Law in Opposition to Defendant, UAB Health System's ("UABHS" or "Defendant") Motion for Summary Judgment.

## INTRODUCTION

Plaintiff's only claim in this case is retaliatory termination. The Defendant has re-cast the issues in a way to distract the Court from the fact that there is substantial evidence creating a triable issue as to the Defendant's retaliatory intent in this case – much of which is undisputed. Essentially, Plaintiff made three (3) separate complaints about his manger's racially discriminatory actions and, immediately following those complaints, his Manager retaliated against him, finally suspending and then terminating him for a security violation he could not have committed.

1

Despite the Defendant's mischaracterization of Plaintiff's claims, the only adverse employment action he alleged in this case is termination. The other retaliatory conduct in which his Manager engaged further establishes that retaliation was the "but-for" cause of Plaintiff's termination.

## SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is **no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law**." Fed. R. Civ. P. 56(c) (emphasis added). The party moving for summary judgment has the initial burden of showing the Court that there are **no genuine issues of material fact to be decided at trial**. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Only when the moving party has met its burden is the non-moving party required to go beyond the pleadings and demonstrate that there is a genuine issue of material fact for trial. Id. at 324. A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995) (per curiam) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When the Court makes this determination, "the evidence **must be viewed in the light most favorable to the party opposing the motion for summary**

2

**judgment**, **and all justifiable inferences are to be drawn in that party's favor**." See Anderson, 477 U.S. at 255 (emphasis added); see also, e.g., IPXL Holdings, LLC v. Amazon.com, Inc., 430 F.3d 1377, 1380 (Fed. Cir. 2005).

It has long been held in this Circuit that summary judgment should be used cautiously in discrimination cases where the motive and intent of an employer is a primary issue. Simmons-Myers v. Caesars Entertainment Corp., 2:10cv216-WAP-JMV (N.D. Miss. Jul. 12, 2012) (citing Hayden v. First Nat. Bank of Mt. Pleasant, Tex., 595 F.2d 994, 997 (5th Cir. 1979) (finding that, in employment discrimination cases, which usually necessarily involve examining motive and intent, granting of summary judgment is especially questionable)[1]; Delgado v. Lockheed-Georgia Co., a Div. of Lockheed Corp., 815 F.2d 641, 644 (11th Cir. 1987) (ruling that, "[a]s a **general rule, summary judgment is not a proper vehicle for resolving claims of employment discrimination[,] which often turn on an employer's motivation and intent**.") (emphasis added); Beard v. Annis, 730 F.2d 741, 743 (11th Cir. 1984) (instructing "**that the disposition of an employment discrimination case by summary judgment should be used cautiously**.") (emphasis added).

---

[1] Decisions of the former Fifth Circuit handed down before September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. Prichard, 661 F.2d 1206 (11th Cir. 1981).

## STATEMENT OF UNDISPUTED FACTS

A. <u>Introduction and Overview</u>

Plaintiff was employed with UABHS as a Systems Analyst II from January 3, 2013 until April 22, 2015[2]. (Doc. 21, p. 3, ¶ 1; Pla. Ex. 33, p. 1). Mr. Jeff Dunkerley ("Dunkerley") was Plaintiff's Manager during his employment with UABHS. (Pla. Ex. 1. p. 14:10-16; Pla. Ex. 3, p. 18:12-16). Plaintiff filed three (3) separate complaints against Dunkerley for race discrimination and/or retaliation before being fired. (Pla. Ex. 3, p. 39:14-21; Pla. Ex. 4, pp. 14:11-18, 28:2-6). Plaintiff's last complaint against Dunkerley was lodged on April 9, 2015. (Pla. Ex. 4, pp. 110:23-111:20; Pla. Ex. 5).

Defendant initially proffered what appeared to be a blended reason for Plaintiff's termination, although Defendant's Motion for Summary Judgment brief trimmed it down to a single, inexplicit reason. (Doc. 21, p. 21; Pla. Ex. 6). The first was a <u>routine</u> deletion of computer test code or "module"; the second was the supposed, <u>attempted</u> removal of a UserID from a Test Group. (Pla. Ex. 2, pp. 98:3-102:2; Pla. Ex. 7, Bates 120). The "deletion" of test code, and the "removal" of a UserID from a Test Group are different actions. (Pla. Ex. 1, p. 82:2-21; Pla. Ex. 3, p. 227:16-20). Plaintiff <u>deleted</u> test code as a matter of course, as did Dunkerely and

---

[2] Plaintiff's was suspended April 14, 2015, never to return. (Pla. Ex. 1, p. 17:15-17; Pla. Ex. 6)

4

others.  (Pla. Ex. 2, pp. 116:13-119:23; Pla. Ex. 7, Bates 119).  To the extent Defendant suggests that the deletion and purported attempted removal relate, Plaintiff "could not have hidden that [he] deleted a [test] module by removing [his] [UserID] from the test group.  **It's absurd**."  (Pla. Ex. 1, p. 82:2-21)

Dunkerley recruited Mr. John Bandy ("Bandy") to investigate Plaintiff following the alleged security alert.  (Pla. Ex. 2, pp. 84:22-86:3, 92:18-21, 94:8-10).  Bandy was unaware that Plaintiff had filed complaints about Dunkerley.  (Pla. Ex. 2, pp. 86:4-90:20, 93:9-13; but see Pla. Ex. 2, pp. 120:22-121:2).  He did not know that Dunkerley recently told HR he would "take off the gloves" when dealing with Plaintiff.  (Pla. Ex. 2, p. 127:10-20).  He did not know that Dunkerley told HR that Plaintiff was on a 90 day performance plan, when in fact Plaintiff was not on such a plan.  (Pla. Ex. 2, p. 127:15-20; Pla. Ex. 3, pp. 69:3-72:1; Pla. Ex. 8; Pla. Ex. 9).  Bandy did not know Dunkerley's responses to Plaintiff's first two (2) complaints against Dunkerley.  (Pla. Ex. 2, pp. 86:4-90:17, 93:9-13).  As such, Bandy blindly followed Dunkerley's direction on the investigation that ensued.  (Pla. Ex. 2, pp. 92:18-21, 97:15-21, 98:13-15, 122:3-124:11, 127:5-9, 134:4-135:19).  Bandy was later surprised that Dunkerley withheld information about the complaints.  (Pla. Ex. 2, pp. 129:17-130:3).

Conveniently, Bandy was also completely unfamiliar with the subject matter at hand.  (Pla. Ex. 2, pp. 38:16-39:2, 50:16-21, 65:7-67:4, 110:8-17, 115:15-116:19).

Because Bandy did not understand the information, Dunkerley led him to believe that deleting test code was "something very unusual", when in fact it was common and harmless. (Pla. Ex. 1, pp. 91:13-21, 113:12-18, 129:3-16; Pla. Ex. 2, pp. 119:5-23, 93:21-94:17, 98:7-102:2; Pla. Ex. 7, Bates 119). All of the information Bandy used in his "investigation" was given to him by Dunkerley, or those potentially loyal to Dunkerley. (Pla. Ex. 2, pp. 97:6-9, 110:8-111:4, 114:18-115:5, 148:14-18, 165:5-13, 171:4-14, 180:3-22, 203:5-19, 223:4-17). Bandy did not independently verify the authenticity of the information he received. (Pla. Ex. 2, pp. 110:18-111:4, 126:10-127:9, 141:13-143:2, 149:8-16, 171:8-23, 204:2-14, 230:16-232:6, **238:6-17, 239:5-9**, 246:3-247:4). He did not verify that the alleged security violation ever even occurred; he instead trusted what he was told. (Pla. Ex. 2, pp. 128:8-129:10). Bandy's boss, Mr. Donald Fast ("Fast") knew Bandy had a tendency to draw "inaccurate" conclusions, and later claim that's "what he had been told." (Pla. Ex. 2, pp. 240:17-241:9; Pla. Ex. 10, Bates 204). Fast's review of Bandy's thoroughness was explained in a 2014 evaluation of Bandy as follows:

> [t]here have been multiple occasions where [Bandy has] drawn conclusions that were inaccurate, and after learning this, [he] would describe it as [being] based on 'what he had been told.' [Bandy] needs to realize that sometimes the first question doesn't quite get the real answer he needs… [r]ather than simply disclaiming it as 'that's what I heard', [Bandy] needs to dig a little deeper, and be more skeptical of the data….

(Pla. Ex. 10, Bates 204). Information that could have completely exonerated Plaintiff was ignored or destroyed[3] in this case. (Pla. Ex. 2, pp. 106:3-107:4, 135:15-19, 181:4-18, 182:12-183:6, 230:16-232:6). In "hindsight", Bandy "would probably verify some of the data a little bit more" so as to not "[feel] like [he] had been played like a puppet" again. (Pla. Ex. 2, pp. 83:15-17, 127:1-128:4, 246:22-23, 124:2-11). Even if there was an attempt to remove Plaintiff's UserID from the Test Group, Bandy knew an imposter could log on to the system as Plaintiff. (Pla. Ex. 2, pp. 83:23-84:13, 228:8-12). But even if it had been Plaintiff attempting a removal, it was "probably not" a good reason to terminate him according to Bandy. (Pla. Ex. 2, p. 209:14-22; Pla. Ex. 12; Pla. Ex. 3, pp. 281:12-282:11).

### B. Plaintiff's First Complaint against Dunkerley

---

[3] Plaintiff requested "[v]ideo footage recorded on April 14, 2015 between the hours of 7:00 a.m. and 11:00 a.m. on the 4th floor of the General Services Building" which would have shown Plaintiff committing the alleged violation, had he committed it. (Pla. Ex. 11, pp. 1, 7). On the date of the discovery cutoff, December 19, 2016, Defendant responded, in an email to the undersigned, advising that the requested video footage was not available, as it had been deleted, notwithstanding Defendant's obligation to retain such evidence because litigation was likely to ensue. (See Pla. Ex. 2, pp. 105:12-106:1). See also, Robinson v. Gielow, No. 3:14CV223, 2015 WL 4459880, at *4 (N.D. Fla. July 21, 2015) (borrowing from other courts that it is generally understood that "[o]nce on notice [that evidence is relevant], the obligation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation.") See e.g., Telecom Intern'l. Am. Ltd. v. AT & T Corp., 189 F.R.D. 76, 81 (S.D.N.Y. 1999); Wiginton v. Ellis, No. 02–C–6832, 2003 WL 22439865 at *5 (N.D.Ill. Oct. 27, 2003).

Plaintiff submitted the first complaint about Dunkerley to Ms. Jeanie Singer ("Singer")[4] and others on August 25, 2014.  (Pla. Ex. 4, pp. 28:7-21, 29:9-30:12; Pla. Ex. 13, Bates 2614, ¶ 2; Pla. Ex. 14).  It was a "formal complaint for Title VII discrimination violation[s], per the UAB Employee Handbook."  (Pla. Ex. 4, p. 30:8-12; Pla. Ex. 14).  Dunkerley was aware of the complaint straight away.  (Pla. Ex. 4, pp. 32:1-5, 34:4-13; Pla. Ex. 15).

Dunkerley responded by disparaging Plaintiff to HR, and seeking to punish him for matters which occurred before the first complaint, but that he did not bother with previously.  (Pla. Ex. 4, pp. 41:1-44:17; Pla. Ex. 16).  Singer received Dunkerley's remarks and request to punish Plaintiff.  (Pla. Ex. 4, pp. 44:18-45:9; Pla. Ex. 17).  On Thursday, August 28, 2014, Dunkerley sent additional disparaging "Information" to HR about Plaintiff, much of which predated Plaintiff's first complaint.  (Pla. Ex. 4, pp. 34:21-36:23; Pla. Ex. 18). Singer received Dunkerley's "Information" about Plaintiff as well.  (Pla. Ex. 4, pp. 37:1-3).

On August 29, 2014, Plaintiff sent an email to Dunkerley informing him that it proved difficult to do his job because he was excluded from emails, discussions, and communications pertaining to his assigned projects.  (Pla. Ex. 4, pp. 60:2-9; Pla.

---

[4] Singer is the Director of Sourcing and Work Force Development for UAB's Health Services Foundation ("HFS"), which provides Human Resources ("HR") support to Defendant.  (Pla. Ex. 4, pp. 22:16-23:12, 27:11-12).  Some of the emails or complaints Dunkerley sent to HR about Plaintiff were first sent to Hospital HR Liaison, Ms. Audrey McClinton.  (Pla. Ex. 4, pp. 23:21-24:14).

Ex. 19).  Dunkerley ignored Plaintiff's concerns about not being able to do his job because he was left in the dark.  (Pla. Ex. 19).  On September 26, 2014, Dunkerley reported to Singer that "Louis's expected start time for the work day is [7:00 a.m.]. He did not show up today until 7:30 [a.m.] and he did not notify me that he was going to be late."  (Pla. Ex. 4, p. 51:2-12; Pla. Ex. 20).  Previously, Dunkerley kept such matters "in house", and did not send them to HR.  (Pla. Ex. 3, pp. 37:4-10, 90:3-91:5; Pla. Ex. 4, pp. 38:4-7, 49:20-50:22).

Dunkerley provided more, previously insignificant information about Plaintiff's punctuality to HR on October 8, 2014.  (Pla. Ex. 4, pp 54:7-56:15; Pla. Ex. 21).  Plaintiff was thirty (30) minutes late one (1) day the month prior; twenty (20) minutes late one (1) day the week prior, "stopping by his desk to drop off his stuff, [but] [] not com[ing] back to his desk until 7:45 [a.m.]"; and **on time** one (1) day the week prior, but was loud when he came in.  (Pla. Ex. 4, pp. 54:7-56:15; Pla. Ex. 21).  Dunkerley's distress with Plaintiff's punctuality conflicted with his own view of Defendant's policy in that Plaintiff did not need to clock in or out.  (Pla. Ex. 3, pp. 46:12-48:21).  Plaintiff's was the only employees' punctuality Dunkerley ever brought to Singer's attention.  (Pla. Ex. 4, p. 46:15-16; but see Pla. Ex. 4, p. 53:3-12).  Singer sat by as Dunkerley subjected Plaintiff to constant scrutiny – a recognized form of retaliation – and poisoned HR's opinion of Plaintiff.  (Pla. Ex. 4, pp. 51:2-52:5, 64:4-9, 66:15-23).

C. <u>Plaintiff's Second Complaint Against Dunkerley</u>

Plaintiff filed a Charge of Discrimination (the "First Charge") with the Equal Employment Opportunity Commission ("EEOC") against Defendant on October 24, 2014.  (Pla. Ex. 22; Pla. Ex. 4, p. 64:10-16; Pla. Ex. 3, p. 76:18-22).  Dunkerley and Singer learned of the First Charge before Plaintiff returned from a leave of absence, which began on October 3, 2014.  (Pla. Ex. 4, pp. 65:5-66:12).  On or about December 29, 2014, Plaintiff returned to work.  (Pla. Ex. 4, pp. 97:10-12, 102:2-6).  When Plaintiff returned to work, Dunkerley administered Plaintiff's second, annual review.  (Pla. Ex. 4, p. 97:6-17).

Plaintiff's first, annual review period was from October 1, 2012, through September 30, 2013.  (Pla. Ex. 23).  Dunkerley considered Plaintiff a good coder at that time, and his evaluation remarks were generally positive.  (Pla. Ex. 3, p. 29:10-15; Pla. Ex. 23).  Plaintiff's second, annual review period was from October 1, 2013, through September 30, 2014.  (Pla. Ex. 24, Bates 9-13)[5].  Dunkerley no longer considered Plaintiff a good coder, even though Plaintiff's skills were unchanged.  (Pla. Ex. 3, p. 30:1-10).  Dunkerley noted a number of project deficiencies in the second, annual review.  (Pla. Ex. 24).  Plaintiff was, in fact, making every effort to

---

[5] Dunkerley did not administer Plaintiff's second evaluation until December 29, 2014.  (Pla. Ex. 3, pp. 76:23-77:9).

advance the projects, and Dunkerley was aware of the same when he cited project deficiencies in Plaintiff's second, annual review.  (Pla. Ex. 1, pp. 280:19-292:5, 327:6-331:23; see e.g., Pla. Ex. 25, Bates 70, 137-38).  On January 8, 2015, Plaintiff informed Singer's direct report, Ms. Joan Wilson ("Wilson"), that he was being set up for termination.  (Pla. Ex. 4, p. 103:2-23; Pla. Ex. 26, p. 2, ¶ 2).

Wilson, Dunkerley, and Dunkerley's Supervisor, Ms. Melanie Turner ("Turner"), held a conference call about Plaintiff on March 5, 2015.  (Pla. Ex. 4, pp. 79:7-81:16; Pla. Ex. 27; Pla. Ex. 8).  Wilson jotted handwritten notes from the call.  (Pla. Ex. 4, p. 82:15-20; Pla. Ex. 8).  Wilson transferred some of her notes to a typed document titled "March 5, 2015 Meeting – Jeff Dunkerley, HSIS"[6].  (Pla. Ex. 9).

Dunkerley suggested to Wilson and Turner that Plaintiff was sixty (60) days into a ninety (90) day performance plan, even though that was not true.  (Pla. Ex. 3, pp. 69:3-72:1; Pla. Ex. 4, pp. 82:21-94:16; Pla. Ex. 8; Pla. Ex. 9).  Dunkerley testified as follows:

> Q: Did you ever place [Plaintiff] on a performance improvement plan?
>
> A: No.
>
> …

---

[6] Sanitizing the record of Dunkerley's statements showing retaliatory animus that "Jeff trump[s] Louis" and that he would "take off the gloves" on Plaintiff, Wilson did not transfer that information to her typewritten notes.  (Compare Pla. Ex. 8 with Pla. Ex. 9).

A: Do you recall ever indicating to either [Wilson] or [Singer] that [Plaintiff] was 60 days into a 90-day performance improvement plan?

A: I think so, yes.

Q: … why would you indicate to them that he's 60 days into a performance improvement plan if he was never placed on one?

A: I don't have an answer for that.

(Pla. Ex. 3, pp. 69:3-70:3).  Dunkerley also said that "it will be his word against mine" regarding Plaintiff's productivity, and that "Jeff [t]rump[s] Louis".  (Pla. Ex. 3, pp. 164:22-166:6; Pla. Ex. 8).  Dunkerley then "admit[ted] [he] felt [his] hands ha[d] been tied" by HR regarding Plaintiff, but that he would "**take off the gloves**".  (Pla. Ex. 3, pp. 163:5-164:16; Pla. Ex. 4, p. 95:2-20; Pla. Ex. 8) (emphasis added).  Dunkerley does not deny that he told Wilson and Tuner that he would "take of the gloves."

Dunkerley sent another email to Singer and Wilson on March 23, 2015.  (Pla. Ex. 4, p. 104:8-23; Pla. Ex. 28).  This time, Dunkerley supplied a list of projects he purportedly reassigned from Plaintiff.  (Pla. Ex. 4, pp. 104:8-105:20; Pla. Ex. 28, Bates 2490-2491).  Neither Singer nor Wilson verified a need to reassign projects.  (Pla. Ex. 4, pp. 105:21-107:9).

D. Plaintiff's Third Complaint Against Dunkerley

On Thursday, April 9, 2015, Plaintiff lodged a third complaint against Dunkerley titled "Retaliation".  (Pla. Ex. 4, pp. 110:19-111:20; Pla. Ex. 5).

Dunkerley almost immediately shot off more emails to HR with allegations against Plaintiff. (Pla. Ex. 4, pp. 117:1-122:18; Pla. Ex. 29; Pla. Ex. 30).

E. Plaintiff's Termination and the Investigation

On Tuesday, April 14, 2015, at precisely 8:17:48 a.m., a Resource Access Control Facility ("RACF") security violation purportedly[7] occurred. (Pla. Ex. 1, p. 41:2-21; Pla. Ex. 7, Bates 112). With little delay, Dunkerley suspended Plaintiff and his access to the system. (Pla. Ex. 7, Bates 122). Dunkerley contacted Bandy to investigate the violation, and deletion of test code from the day before. (Pla. Ex. 2, pp. 85:2-86:3, 92:18-21, 94:7-10). Bandy did not understand RACF or RACF security violations. (Pla. Ex. 2, pp. 38:16-39:2, 50:7-21, 65:7-66:6). Nevertheless, Bandy began the investigation on April 15, 2015. (Pla. Ex. 2, p. 90:21). To memorialize his findings, Bandy generated an Incident Response Report[8] (the "Report"). (Pla. Ex. 2, p. 104:10-17; Pla. Ex. 7, Bates 111-148).

The same day he started the investigation, Bandy sent an initial draft of the Report to Dunkerley and Mr. David Winingham ("Winingham"), asking them to **verify** that this "is what happened[,] and is on the right date and time frame". (Pla. Ex. 2 pp. 121:18-124:1; Ex. 31, Bates 2156). That very first draft of the Report

---

[7] Plaintiff states that it "purportedly" occurred because, as set forth more fully below, Bandy's Incident Response Report does not contain evidence that such a violation ever actually occurred.

[8] Mr. Bandy generated six (6) to eight (8) "drafts" of the Report before sending a final version to his boss for approval.

already contained a "Summary" and "Conclusion" referencing Plaintiff's guilt.  (Pla. Ex. 31, Bates 2158-2159). The Report, and Dunkerley's April 23, 2015, termination letter to Plaintiff, both indicate UABHS terminated Plaintiff because he deleted test code on Monday, April 13, 2015, and attempted to remove his UserID from a RACF security file at 8:17 a.m. the next morning.  (Pla. Ex. 7, Bates 112-113; Pla. Ex. 6, Bates 149).   Dunkerley and Turner[9] were the decision-makers as to Plaintiff's termination.  (Pla. Ex. 33, p. 4, ¶¶ 1-2).  Dunkerley testified that he relied on the information in the Report to terminate Plaintiff.  (Pla. Ex. 3, pp. 80:11-81:2).

### 1.  The Test Code/Module Deletion

Despite what Dunkerley told Bandy at the outset of the investigation, deleting test code from the test region is not unusual; in fact, it is common.  (Pla. Ex. 2, pp. 98:7-102:2; Ex. 7, Bates 119; Pla. Ex. 1, pp. 91:13-21, 113:12-18, 129:2-15). Dunkerley deleted test code from the same test region of the same project on seven (7) occasions the very same day. (Pla. Ex. 2, pp. 100:9-102:2; Pla. Ex. 7, Bates 119; Pla. Ex. 3, p. 227:7-11).  Two (2) other employees deleted in the same test region of the same project that day as well.  (Pla. Ex. 7, Bates 119; Pla. Ex. 2, pp. 118:15-22). Bandy's investigation documents revealed this, but he ignored it because Dunkerley

---

[9] Although the Defendant asserts that Turner made the decision to terminate Plaintiff with Dunkerley, it is readily apparent from the evidence that Turner's role, if any, was minor.  (Pla. Ex. 1, p. 43:1-11).  Either way, Turner was also aware of Plaintiff's complaints (Pla. Ex. 1, p. 258:12-14), and Dunkerley's previous threat to "take off the gloves" on Plaintiff (Pla. Ex. 4, p. 95:2-6; Pla. Ex. 27; Pla. Ex. 8; Pla. 9).

told him to focus on Plaintiff.  (Pla. Ex. 2, pp. 100:9-102:2; Pla. Ex. 7, Bates 119).

Bandy testified as follows:

> Q: The deletion of a program or file in a test group is unusual?
>
> A: Yes.  Because of this source code program….
>
> …
>
> Q: So if … we have Jeff Dunkerley deleting [seven] files that same day in the same region and [] on the same project… are you still telling me that is an unusual event?
>
> A: **I was taking Jeff's word at that, that it was unusual.  I was taking Jeff Dunkerley's word that it was an unusual event.  He said that he had never seen a delete like that before.**
>
> Q: [Y]ou said earlier that you analyzed and reviewed all of the documents that went into your report.  Did you notice that Jeff Dunkerley himself had deleted [seven] files in that very same region that very same day?
>
> A: I did not.  I was zeroing in on the time frame that he gave me.
>
> Q: Did you not feel it prudent to follow up with [Dunkerley] about his own deletions?
>
> A: I did not[10].

---

[10] Bandy believed Plaintiff's deletion of test code was significant to his investigation, until it was shown to him in his deposition that several other individuals, including Dunkerley, deleted test code from the test region the same day as well.  After being shown this evidence at his deposition, and after taking a break, Bandy changed his testimony to as follows: "I do want to clarify something I said earlier, that – and that's one of the reasons **why I didn't find the delete as concerning**.  The incident that I got called in on that we were investigating was him trying to remove his UserID."  (Pla. Ex. 2, pp. 146:14-147:1) (emphasis added).

(Pla. Ex. 2, pp. 98:23-101:16; Pla. Ex. 7, Bates 119) (emphasis added).   It is undisputed that Dunkerley deceived Bandy into believing that a deletion in the test region was an unusual event, like he deceived HR about the 90 day performance plan.   (Pla. Ex. 2, pp. 98:9-102:2; Ex. 7, Bates 119).   Bandy would have caught the lie, but he did not analyze the investigative documents himself which, on their face, revealed Dunkerley's dishonesty.   (Pla. Ex. 2, p. 100:9-16).   The Report and the Termination Letter are replete with references to the <u>deletion</u> of test code, although Defendant now disavows any such basis for terminating Plaintiff.   (Pla. Ex. 7, Bates 112-113; Pla. Ex. 6; Doc. 21, p. 21).

## 2. The RACF Security Violation

Plaintiff has maintained that he did not commit a RACF security violation. (Pla. Ex. 1, pp. 43:4-21, 82:2-83:14, 137:6-23; Pla. Ex. 7, Bates 122, 125, ¶ 4). Plaintiff "categorically den[ied] [the] claim" that he tried to remove his "[UserID] from the test group."   Plaintiff only had "user" privileges within the RACF system. (Pla. Ex. 1, p. 137:6-23).   Plaintiff insisted to Bandy that there was no reason to try to remove it, and he did not have the "special access privilege in order to execute that command" even if he wanted to try.   (Pla. Ex. 1, p. 80:1-8).   As Plaintiff testified, "I'm locking myself out of all the resources that I have to access on a daily basis to perform my job" by removing the UserID from the Test Group.   (Pla. Ex. 1, p. 82:2-21).   As such, "it's not self-serving to remove your ID from the test user group."

(Pla. Ex. 1. p. 82:2-21).  Without guessing, Defendant's investigator was unable to articulate a reason why Plaintiff would even consider an attempting a UserID removal.  (Pla. Ex. 7, Bates 113-114).

Setting motive aside, Bandy and Dunkerley should have known Plaintiff was not in the building at 8:17 a.m. on Tuesday, April 14, 2015.  (Pla. Ex. 2, pp. 215:4-220:5).  The Report contains surveillance photos with time stamps **showing that Plaintiff did not enter the building until 8:21:54 a.m. on April 14, 2015**.  (Pla. Ex. 7, Bates 116-118).  Bandy attempted to explain away this critical fact by asserting he was told the security servers were eleven (11) minutes fast[11], but neither he nor Singer attempted to verify that was true.  (Pla. Ex. 2, p. 141:7-20; Pla. Ex. 4, p. 173:9-12).  Despite numerous cameras at Defendant's disposal, there was not any video footage that put Plaintiff at his desk at 8:17 a.m. on the date in question.  (Pla. Ex. 2, p. 105:12-19).  Even if the eleven (11) minute inconsistency were true, it is undisputed that Dunkerley confronted Plaintiff in the hallway when Plaintiff came in that day.  (Pla. Ex. 1, pp. 51:14-52:10; Pla. Ex. 6; Pla. Ex. 3, pp. 62:2-9, 252:22-257:14).  Mr. Gary Slaten ("Slaten") stopped Plaintiff on his way in that morning as well.  (Pla. Ex. 1, pp. 47:5-49:22; Pla. Ex. 3, p. 253:15-18).  Most notably, **when**

---

[11] It should also be noted that the Defendant does not raise this issue in its brief.  It can reasonably be inferred, then, that the assertion is baseless.

**Dunkerley stopped Plaintiff on his way in that morning, the alleged security violation had already occurred**.  (Pla. Ex. 6, ¶ 4).

Defendant's documents and actions are replete with anomalies.  The Report contains a document titled "Log Trying to Remove User ID from Test Group."  (Pla. Ex. 7, Bates 120).  Bandy included this document in the Report not knowing what it was, or how to interpret it.  (Pla. Ex. 2, p. 115:15-21).  He also did not verify its authenticity; Bandy merely accepted it for what someone else purported it to be.  (Pla. Ex. 2, pp. 110:8-111:4, 114:18-21).  This document[12] is supposed proof that Plaintiff's mainframe UserID, "LWJONES", committed the RACF security violation.  (Pla. Ex. 2, p. 114:18-22).  However, even a cursory inspection of the document reveals that the UserID for the "Owner" of the record is "SPDAVID", not "LWJONES".  (Pla. Ex. 7, Bates 120).  Bandy did not inspect the record closely enough to notice the discrepancy, and he does not have an explanation for why someone else's UserID is in in the record.  (Pla. Ex. 2, pp. 114:13-116:19, 133:6-9).

Bandy can't say "[w]hether [Plaintiff] used [his UserID] or someone else used it" to commit the alleged violation.  (Pla. Ex. 2, p. 111:19-22).  He can, however, say that someone other than Plaintiff could have logged into the system on April 14,

---

[12] Which is in most of the versions of the Report, and discussed several times throughout Bandy's deposition as one document. Although it was in different versions, including the Final Report, it never changed.

2015, using Plaintiff's mainframe UserID and password[13].  (Pla. Ex. 2, pp. 84:2-13, 157:15-158:10, 228:8-12).  It had happened before.  Bandy did not investigate this possibility.  (Pla. Ex. 2, pp. 157:20-158:4).

Plaintiff's computer identification was "2UA3041NT5".  (Pla. Ex. 2, p 191:1-9).  Appendix "D" to the Report is an Active Directory ("AD") report showing log on and log off events for 2UA3041NT5 for April 13, 2015, and April 14, 2015.  (Pla. Ex. 2, pp. 194:16-195:5; Pla. Ex. 7, Bates 121).  An active logon to a computer is a successful logon where "somebody **walked up to the machine and hit control [+] delete**" and "credentials [were] entered" thereafter.  (Pla. Ex. 2, p. 195:6-17).  When, on the AD report "2UA3041NT5" is present for an event, that notation is "reflecting [that] what is being done[,] is **being done from that machine**."  (Pla. Ex. 2, pp. 221:20-223:21, 191:4-9) (emphasis added).

The Card Access ("CA") report contained in the Report, coupled with the AD report, shows that someone logged into Plaintiff's computer when he was not there.  (Pla. Ex. 2, pp. 221:15-223:5; Pla. Ex. 7, Bates 144-148).  The CA report shows when Plaintiff badged-in and badged-out of the building on April 13, 2015, and on April 14, 2015.  (Pla. Ex. 7, Bates 147).  The AD report shows that on April 13,

---

[13] Dunkerley had utilized a "key logger" program on the mainframe system in the past.  (Pla, Ex. 3, pp. 94:3-95:20).  A "key logger" program is designed to collect computer keystrokes so that whomever installed the program is able to harvest UserIDs and passwords.  (Pla Ex. 2, pp. 158:15-17, 228:13-23).

2015, "louisjones" successfully logged on to 2UA3041NT5 at 7:00:02 a.m.  (Pla. Ex. 2, p. 221:20-223:8; Pla. Ex. 7, 121).  However, the CA report shows that Plaintiff did not badge-in to the building until 8:31:57 a.m. on April 13, 2015.  (Pla. Ex. 2, p. 223:4-8;  Pla.  Ex.  7,  Bates  147).    Whomever  logged  on  to  2UA3041NT5  as "louisjones" on April 13, 2015, logged off at 8:27:09 a.m., minutes before Plaintiff entered the building.  (Pla. Ex. 2, pp. 226:2-228:12).  Bandy testified that he noticed this discrepancy, but "glossed over it" because of what Dunkerley had told him about Plaintiff. (Pla. Ex. 2, p. 223:9-17).

Appendix "I" to the Report are screenshots of a **re-creation** of the purported violation by Plaintiff.  (Pla Ex. 2, p. 196:17-22; Pla. Ex. 7, Bates 128).  Appendix "J" to the Report is the record generated from the attempted re-creation represented in Appendix "I".  (Pla. Ex. 2, pp. 201:5-204:14; Pla. Ex. 7, Bates 129).  According to Defendant, page two (2) of Appendix "C" in the final Report is the record of Plaintiff's purported security violation.  (Pla. Ex. 2, p. 198:1-10; Pla. Ex. 7, Bates 120).  Appendix "J" was the record produced when Defendant "re-created" the actions allegedly taken by Plaintiff at 8:17 a.m. on April 14, 2015.  (Pla. Ex. 2, pp. 201:5-204:14).  Bandy did not bother to compare the two (2) logs to one another during his investigation, **which are patently different**.  (Pla. Ex. 2, p. 204:4-6).  He does not know whether Appendix "J" or Appendix "C" more accurately portrays the type of security violation of which Plaintiff was accused.  (Pla. Ex. 2, p. 204:12-14).

Dunkerley did not give Bandy the ability to log in to the RACF system and analyze the original data. (Pla. Ex. 2, pp. 49:11-51:1). Bandy was forced to rely heavily on Dunkerley for information, although his investigation was supposed to be independent. (Pla. Ex. 2, pp. 28:1-20, 123:8-124:1).[14] Bandy is unable to say for sure whether the logs he received were authentic. (Pla. Ex. 2, pp. 110:18-111:4). Bandy is able to say, however, that he would have conducted the investigation differently had he known that Plaintiff reported Dunkerley just a week prior. (Pla. Ex. 2, p. 124:2-11). Bandy understands that having Dunkerley involved in the investigation might create the appearance of a conflict of interest. (Pla. Ex. 2, p. 125:11-23). Had he known of Dunkerley's comments about taking the gloves off, he would have "asked [his supervisor] for direction on how he wanted to proceed with it." (Pla. Ex. 2, p. 130:4-18).

Bandy testified that he analyzed and fully considered each piece of paper included in the Report. (Pla. Ex. 2, pp. 42:17-43:4). But he did not notice that Dunkerley deleted the very same files Dunkerley accused Plaintiff of deleting. (Pla. Ex. 2, p. 100:3-16). Dunkerley knew he had deleted them. (Pla. Ex. 3, p. 227:7-11).

---

[14]Bandy did not receive any formal training in investigative techniques relevant to the type of investigation he conducted. (Pla. Ex. 2, pp. 64:11-65:6). He had never conducted an investigation into an alleged RACF security violation before, nor received any special training in RACF security whatsoever, so the information that was relevant to that investigation was new to him. (Pla. Ex. 2, pp. 38:16-39:2, 65:7-13). Bandy acknowledged that an investigation involving RACF security violations required special skill in "being able to discern logs, knowing what those logs are telling you." (Pla. Ex. 2, p. 45:9-18).

The RACF log that Bandy received, which purportedly showed Plaintiff's alleged attempt at removing his UserID, appears to belong to another user, "SPDAVID". (Pla. Ex. 7, Bates 120).   Bandy did not notice this irregularity during his investigation.  (Pla. Ex. 2, pp. 114:13-116:19).

The record generated by the supposed re-creation of what Plaintiff **might have done**, is patently different than the record Defendant holds out as the log of Plaintiff's alleged action[15].  (Compare Pla. Ex. 7, Bates 120 with Pla. Ex. 7, Bates 129; Pla. Ex. 2, p. 204:3-11).  Bandy did not compare the two (2) documents and he did not notice their fundamental differences or question their authenticity.  (Pla. Ex. 2, p. 204:4-14).  Bandy even had access to a forensic image of Plaintiff's computer hard-drive **which would have shown exactly what happened on 2UA3041NT5 that day**, "but **we** never looked at it… "[b]ecause **we** felt like the other audit logs collected gave **us** what **we** needed".  (Pla. Ex. 2, pp. 106:3-107:2-8, 135:15-19, 182:12-21) (emphasis added).  Bandy ultimately admits that he "could have done some more due diligence" with respect to the investigation.  (Pla. Ex. 2, p. 245:7-12).  Adding insult to injury, Singer left it to Dunkerley to ensure that the "dates and times [were] correct" with respect to Defendant's position as to the reason for termination in the termination letter.  (Pla. Ex. 34).

---

[15] Which, of course, contains a different user's ID – "SPDAVID".

## ARGUMENT AND CITATION TO AUTHORITY[16]

Under the McDonnell Douglas framework, Plaintiff bears the burden of establishing a *prima facie* case of retaliation, which then creates a presumption that the employer acted unlawfully. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973).  Once Plaintiff establishes his *prima facie* case, the burden of production shifts to the Defendant to articulate a legitimate, non-retaliatory reason for its action. Brown v. Alabama Dep't of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010) (applying framework in retaliation context). If the Defendant meets its burden, the presumption of discrimination is rebutted and the burden of production shifts back to the Plaintiff to offer evidence of pretext. McDonnell Douglas, 411 U.S. at 793.  However, the McDonnell Douglas framework is not essential for a Plaintiff to survive summary judgment. Sims v. MVM, Inc., 704 F.3d 1327, 1332-33 (11th Cir. 2013). "**The plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.**" Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). (emphasis added).

---

[16]The **only** claim Plaintiff has alleged in this action is retaliatory termination. To be clear, Plaintiff has not alleged retaliation based on performance evaluations, hostile work environment, or any other forms of retaliation.  The Defendant has unilaterally raised these issues in its motion for summary judgment perhaps in an effort to distract the court from the overwhelming evidence in the record which indicates that Plaintiff was framed.

A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision-maker. Id. See generally Hamilton v. Southland Christian School, Inc., 680 F.3d 1316, 1320 (11th Cir. 2012). The "ultimate question" is not whether a plaintiff has established a prima facie case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." Nix v. WLCY Radio/Rahall Comm., 738 F.2d 1181, 1184 (11th Cir. 1984).

## I.    Plaintiff has established his *prima facie* case of retaliation

To establish a prima facie case of retaliation, a plaintiff must show that he engaged in protected activity, he suffered a materially adverse action, and a causal connection between the activity and the adverse action exists. Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1258 (11th Cir. 2012); Dixon v. The Hallmark Companies, Inc., 627 F.3d. 849, 856 (11th Cir. 2010).  The first two *prima facie* elements of Plaintiff's retaliation case are indisputably established.[17] The filing of an EEOC Charge is a statutorily protected activity. Smith v. City of Fort Pierce, Fla., 565 F. App'x 774, 776-777 (11th Cir. 2014).  Statutorily protected activities also include complaints to supervisors about unlawful discrimination. Shannon v.

---

[17] The Defendant does not dispute that all of the complaints constitute protected activity and that Plaintiff's termination constitutes an adverse action. In fact, the Defendant's only challenge to Plaintiff's wrongful termination claim is to the "causation" element. (Doc. 21, p. 19).

Bellsouth Telecomms., Inc., 292 F.3d 712, 715 n. 2 (11th Cir. 2002).  Therefore, Plaintiff's two (2) informal complaints of race discrimination submitted to HR and UAB Leadership, and his EEOC charge are all statutorily protected activities. Plaintiff's termination on April 22, 2015 was plainly an adverse employment action. Clark v. South Broward Hospital District, 601 F. App'x 886, 891 (11th Cir. 2015).

To establish a causal connection, the third element of Plaintiff's *prima facie* case, Plaintiff must first show that the decision-makers were aware of his complaint, and that his complaint and termination were not wholly unrelated. Smith, 565 F. App'x at 778. Plaintiff is not required to establish "the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant." Simmons v. Camden County Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985); see also Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913. 920 (11th Cir. 1993); Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1525 (11th Cir. 1991). Rather, Plaintiff can satisfy the third element by presenting evidence that his protected activities and the subsequent adverse employment actions are not totally unrelated. Simmons, 757 F.2d at 1189; see also Hairston, 9 F.3d at 920; Weaver, 922 F.2d at 1525; See Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) ("A plaintiff satisfies this element if she provides sufficient evidence of knowledge of the protected expression and that

there was a close temporal proximity between this awareness and the adverse action."); Gupta v. Florida Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000) ("To establish a causal connection, a plaintiff must show that the decision-maker [s] [were] aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated.").

Recently, "retaliation claims require proof that the [employer's] desire to retaliate was the but-for cause of the challenged employment action." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013); see also Smith, 565 F. App'x at 778 (recognizing that after Nassar, prima facie case of retaliation requires showing of but-for causation). However, the but-for cause of a challenged employer action **need not be the sole cause of the action**. Burrage v. United States, 134 S.Ct. 881, 888 (2014).  As the Supreme Court explained, even when competency issues exist and are combined with the retaliatory animus of a supervisor, a genuine issue of material fact can exist as to whether an instance of protected activity was "the straw that broke the camel's back." Id.; see also Roberts v. Alabama Dep't of Youth Servs, No. 2:2013cv00355, 2015WL590179, at *5 (M.D.Ala. Feb. 11, 2015) (finding that Plaintiff clearly established evidence of but-for causation where Defendant argued Plaintiff was terminated for disciplinary and competency issues, but where supervisor stated he intended to "fire [the employee's] ass" if he had filed an EEOC charge).

26

### A.   It is undisputed that Dunkerley had knowledge of Plaintiff's protected activity

In order to establish a causal connection, "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993); see also Weaver, 922 F.2d at 1525.  There is no dispute that Dunkerley, who made the decision to terminate Plaintiff,[18] was aware of each of Plaintiff's complaints. The Defendant does not appear to dispute this fact, as it only argues that Dunkerley "did not consider Plaintiff's prior complaints" when deciding to terminate Plaintiff. (Doc. 21, p. 10).

The Defendant attempts to pull the investigator into the decision-making process, stating that "Bandy did not know about Plaintiff's prior protected activity."[19] (Doc. 21, p. 19).  However, he was not a decision-maker.  Instead, he simply a report of findings, the validity of which are questionable at best, and upon which Dunkerley testified he based the final decision to terminate.  Regardless of the investigator's knowledge, or lack thereof, this case still involves the biased decision-maker, Dunkerley. In other words, the very supervisor accused of

---

[18]Although the Defendant asserts that Melanie Turner made the decision to terminate Plaintiff along with Dunkerley, it is clear from the evidence that Turner's role, if any, was minor. Nevertheless, it is undisputed that she was also aware of Plaintiff's protected activity.

[19] This fact is in dispute, as Bandy included in his final report a copy of an email from Plaintiff mentioning his retaliation complaint against Dunkerley.

retaliating against the Plaintiff mere days before Plaintiff's termination is the very person who tainted Bandy's investigation, and HR, and then made the decision to terminate Plaintiff.

### B.   Plaintiff's complaints and his termination were not wholly unrelated

Plaintiff can show that his complaint and the subsequent termination were not wholly unrelated through close temporal proximity between the protected activity and the retaliatory employment action. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). Plaintiff may also satisfy the causation element, as well as bolster temporal proximity evidence of causation, by presenting other evidence tending to show causation. See, e.g., Weaver, 922 F.2d at 1525 ("The pronounced increase in negative reviews and the careful scrutiny of [the plaintiff's] performance, coupled with testimony suggesting that management personnel were acutely aware of [the plaintiff's] EEOC charge, is sufficient to establish a causal link for [the plaintiff's] prima facie case of retaliatory discharge."); Simmons v. Camden Co. Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985) (finding evidence that the ultimate decision-maker made angry remarks about the protected activity was sufficient to establish the causal connection element). In this case, the temporal proximity, coupled with the substantial evidence of retaliatory intent – the careful scrutiny of Plaintiff for months and his efforts at poisoning HR's opinion of Plaintiff; HR and

Leadership's acute awareness of Plaintiff's complaints; and Dunkerley's threat to "take off the gloves" – are sufficient to establish causation.

### 1. The temporal proximity of Plaintiff's protected activity and his termination demonstrates causation

The Eleventh Circuit recognizes that, in most cases, a short time-span between the two (2) events is often all that an employee will be able to offer to support a retaliation claim. Clark v. South Broward Hospital District, 601 F. App'x 886, 897 (11th Cir. 2015).  A time period as much as one (1) month between the protected activity and the adverse action is not too protracted to support causation. Clark v. S. Broward Hosp. Dist., 601 F. App'x 886, 897 (11th Cir. 2015).

A plaintiff who relies on a theory of temporal proximity must identify a specific instance of a protected activity that is known to the employer's decision-maker, and one which shortly precedes an adverse employment action. See Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1457 (11th Cir. 1998) (calculating time period between filing of EEOC charge and adverse action); Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) (calculating time period between verbal complaints to manager and filing of EEO complaint and adverse action).

The Defendant wants to limit the focus of this Court's analysis to the first instance of protected activity, Plaintiff's first informal complaint on August 25, 2014, which was eight (8) months before his termination.  However, as the Eleventh

Circuit has made it plain that a plaintiff is only required to "identify a specific instance of a protected activity," not necessarily the earliest instance. <u>Wideman</u>, 141 F.3d at 1457. In fact, in a more recent case, the Eleventh Circuit considered "**the latest undisputed instance** of Plaintiff's protected activity" in making its determination of causation.[20] <u>Clark</u>, 601 F. App'x at 898 (emphasis added); <u>Penn v. USF Holland, Inc</u>., 770 F. Supp. 2d 1211, 1241 (N.D. Ala. 2010) (The less than two (2) week proximity of time "between [the protected conduct] and Penn's termination provides further evidence supporting a causal connection between Penn engaging in protected conduct and the adverse employment action").

In a case even more similar to this one, the Eleventh Circuit held that, while the temporal proximity alone was insufficient where the protected conduct occurred one year earlier, it was still possible to establish a causal link based solely on the "very close" proximity between the filing of the lawsuit and termination just over two weeks later. <u>Entrekin v. City of Panama City Florida</u>, 376 F. App'x 987, 996-97 (11th Cir. 2010) (citations omitted). Here, Plaintiff filed his third complaint on April 9, 2015, and was then suspended pending a sham investigation on April 14, 2015. He was then officially terminated on April 22, 2015, less than two (2) weeks

---

[20]The Court did not find causation in that case because the **earliest** instance of protected activity was eight months before the plaintiff's termination **and** there was no additional evidence of retaliation. <u>Id.</u> That is not the case here.

later, by the very person whom Plaintiff had complained about to HR. As such, Plaintiff has established a causal link based solely on this "very close" proximity.

### 2.   There is additional evidence of retaliatory intent that bolsters causation

Even if this Court were to determine that the temporal proximity was too remote to find causation on that basis alone, there is additional evidence of retaliatory intent. Weaver, 922 F.2d at 1525; Simmons, 757 F.2d at 1189. The record in this case is replete with evidence of Dunkerley's intent to retaliate against Plaintiff. Eleventh Circuit precedent has established that causation can be established if a "series of adverse employment actions commenced almost immediately after" the protected activity. Wideman, 141 F.3d at 1457. See Donnellon v. Fruehauf Corp., 794 F.2d 598, 601 (11th Cir. 1986) (acknowledging that a "short period of time [(one month)] between the filing of the discrimination complaint and the . . . [adverse employment action] belies any assertion by the defendant that the plaintiff failed to prove causation.").

Dunkerley immediately began sending emails to HR and Singer complaining about Plaintiff's performance and attendance after the first complaint was lodged. According to Dunkerley, these issues were matters that he had previously kept "in house" prior to Plaintiff's complaint. As such, these complaints were the result of intentional, increased, constant scrutiny and surveillance of Plaintiff following the

filing of his first complaint.  Singer acknowledged that this is a form of retaliation.

In addition, after Plaintiff's EEOC charge was filed, Dunkerley gave Plaintiff a

performance evaluation that was markedly lower than the previous evaluation, and

misleading as to work Plaintiff was completing on assigned projects.   More

egregious than that, Dunkerley represented to HR and his boss, Turner, that Plaintiff

was sixty (60) days into a ninety (90) day performance plan, which he admitted was

a lie.  During that same conference with Wilson and Turner, he informed the HR

representative (Wilson) and his boss (Turner) that he was ready to "take the gloves

off" with respect to Plaintiff.

The Courts in our circuit have held that far less compelling facts were

sufficient to support a *prima face* case of retaliation.  For example, in Ambus v.

AutoZoners, LLC, the plaintiff established that, in the immediate aftermath of his

complaints to management, his supervisor scheduled him for fewer hours compared

to the period preceding the incident. Ambus v. AutoZoners, LLC, 71 F.Supp.3d

1280, 1305 (M.D.Ala. 2014). The district court held as follows:

> Construing the evidence **in the light most favorable to Plaintiff**. . . .
> the reduction in hours would not have occurred in the absence of the
> complaint to Harris. The proximity in time of the overall downward
> trend in hours to the [reporting of the] shoving incident is sufficiently
> close to establish a prima facie retaliation case.

Id. (emphasis added); see also Davis v. Florida Agency for Health Care Admin., 612 F. App'x 983, 986 (11th Cir. 2015) (holding that evidence the plaintiff and her supervisor "got along well . . . until she was interviewed about the discrimination grievance" was sufficient for causation).

Contrary to the Defendant's argument that the harassment and lower performance evaluation did not meet the threshold of an adverse employment action, the Defendant's actions do not have to rise to the level of true "adverse employment actions" in order to be considered as additional evidence of retaliatory intent. The Middle District of Alabama has explained that "purported adverse employment actions may not support a prima facie case for discrimination, **yet still support a prima facie case for retaliation under the same or related facts**." Ambus, 71 F.Supp.3d at 1302 (emphasis added) (citing Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 64 (2006); Shannon, 292 F.3d at 716. A set of actions may constitute a materially adverse action when considered in the aggregate, even if individual actions do not rise to a materially adverse action. This is important in this case because it allows the Court to consider all of Dunkerley's actions as further evidence that retaliation was the "but for" cause of Plaintiff's termination.

## II.     Defendant's articulated reason for terminating Plaintiff is false and a pretext for unlawful retaliation.

In order to show pretext it must be shown that a jury could find that the proffered non-retaliatory reason was false, and that retaliation was the real reason for termination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).  In this case, the Defendant's articulated reason for Plaintiff's termination, as represented to this Court was "the security violation that Bandy's investigation attributed to [Plaintiff]." (Doc. 21, p. 21). More specifically, as the termination letter written by Dunkerley indicates, Plaintiff "tried to remove [his] user ID."

### A.     Viewing the evidence in a light most favorable to Plaintiff, a reasonable jury could find that the Defendant's reason is false

First, it must be reiterated that on summary judgment, "the evidence **must be viewed in the light most favorable to the party opposing the motion for summary judgment, and all justifiable inferences are to be drawn in that party's favor**." See Anderson, 477 U.S. at 255 (emphasis added).  As Plaintiff has demonstrated above, there is an abundance of evidence from which a reasonable jury could find that Plaintiff did not commit the alleged security violation. Plaintiff can either directly persuade the court that a retaliatory reason more likely motivated the employer, or show indirectly that the employer's ultimate justification is not believable. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, (1981); Weaver, 922 F.2d at 1522; Booth v. Pasco Cnty., 757 F.3d 1198, 1207 (11th

Cir. 2014) (a jury may infer that a defendant's action was retaliatory if it is permitted to disbelieve the defendant's explanation for the action).

Perhaps most compelling is the fact that surveillance records prove Plaintiff was not in the building until at least four minutes **after** the alleged security violation occurred. Second, the Defendant cannot dispute that Plaintiff did not have the special access privilege required to execute that command that would have led to the error that occurred. In fact, when the Defendant attempted to re-create the error, the action generated a record that was patently different than the record used against Plaintiff. Couple this evidence with the fact that someone actually accessed Plaintiff's system the previous day before Plaintiff entered the building, and a jury could reasonably infer that someone was giving this security error attempt a "dry run," to see if it would work the next day. There is at least a genuine issue of material fact as to whether Plaintiff actually committed the violation for which he was terminated, and whether it even occurred. More importantly, as the evidence shows, the Defendants were aware of all of these facts, or should have been aware, so they could not have reasonably believed he had committed the violation when they terminated his employment. Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1194-1195 (11th Cir. 2004) (employer claimed it fired plaintiff for participating in an unauthorized infomercial, but it offered differing explanations for the basis of the supposed prohibition).

**B.      There is a genuine issue of material fact regarding whether the Defendant's articulated reason is merely a pretext for retaliation.**

The plaintiff's burden at the pretext stage is that of "cast[ing] sufficient doubt on the defendant's proffered [] reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct...." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000).   A plaintiff may rely on evidence previously submitted as part of her prima facie case. Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000).  Here, the undisputed evidence discussed above, by itself, is sufficient to establish pretext.  The evidence is clear and overwhelming in this case that Plaintiff's supervisor was upset by the complaints Plaintiff had lodged against him, as evidenced by his immediate and consistent antagonism and surveillance of Plaintiff following those complaints. After indicating to HR that he was going to "take the gloves off," this bogus security violation appears, for which Plaintiff was framed.

Additionally, the Defendant's reasons may be shown to be pretextual "by revealing such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [its] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Springer v. Convergys Customer Mgmt. Grp., 509 F.3d 1344, 1348 (11th Cir. 2007). To make this showing, the plaintiff may resort to "all the evidence," Crawford v. Carroll, 529 F.3d 961, 976

(11th Cir. 2008), including "the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom." <u>Reeves</u>, 530 U.S. at 143.

First, it is implausible that the Defendant would have terminated Plaintiff for this security violation in the face of so much evidence that he could not have actually committed the violation.  He was not in the building at the time and did not have the system privileges necessary to have created the security error.  The fact that the Defendant ignored so many inconsistencies in their own records regarding how this security violation may have occurred is also telling. Ultimately, Plaintiff was terminated for an **unsuccessful** **attempt** to delete his UserID. This is likewise implausible, and the termination is not supported by Defendant's own policies.

It was also unreasonable for the Defendant to rely on such an incomplete and biased investigation, conducted by someone who was clueless about the type of violation and the system on which it occurred.  The fact that the investigator relied on the supervisor who had been accused of discrimination and retaliation, one week prior, a fact which the investigator should have known, as it was in his own Final Report, is completely unreasonable.   The overwhelming evidence in this case demonstrates pretext by showing that the Defendant's "asserted business judgment was so ridden with error that defendant could not honestly have relied upon it." <u>In re Lewis</u>, 845 F.2d 624, 633 (6th Cir. 1988); <u>Smith v. Chrysler</u>, 155 F.3d 799, 808-09 (6th Cir. 1998) (courts should consider "whether the employer made a reasonably

informed and considered decision before taking an adverse employment action."); Dister v. Cont'l Group, 859 F.2d 1108, 1116 (2d Cir. 1988) ("facts may exist from which a reasonable jury could conclude that the **employer's 'business decision' was so lacking in merit as to call into question its genuineness," allowing an inference of pretext**) (emphasis added).

Considering all of the undisputed evidence regarding Dunkerley's retaliatory conduct immediately following each complaint Plaintiff made, the circumstances surrounding the alleged security violation, the investigation of said violation and Plaintiff's termination – only days after his last instance of protected activity – Plaintiff has established a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional retaliation by the decision-maker.

Even if this Court were to accept the Defendant's bogus reason for Plaintiff's termination, the question of pretext must be presented to a jury. See Hubbard v. Georgia Farm Bureau Mut. Ins. Co., No. 5:2011cv00290, 2013WL3964908, at *2 (M.D.Ga. July 31, 2013) ("Defendant's arguments must be presented to the jury in response to Plaintiff's claim that her failure to apologize is merely pretext for unlawful retaliation.").

## III.    After-Acquired Evidence Does not Cap Plaintiff's Recovery

As pointed out by Defendant, the job application asked if Plaintiff had been "convicted of any crimes(s)."  (Doc. 21, p. 31).  As Plaintiff testified, he was dishonorably discharged from the military, and subjected to Court Marshall after defending himself from an attack by three (3) individuals at a bar **nearly fifty (50) years ago**.  (Pla. Ex. 1, pp. 360:1-18).  Not only did this unfortunate incident occur nearly fifty (50) years ago, a Court Marshall is not a "conviction" and the Uniform Code of Military Justice ("UCMJ") is not civilian, criminal law.

Had Defendant's application asked about Plaintiff's military service record, he would have answered truthfully, as he did in his deposition.  What's more, Defendant's unlawful retaliation against Plaintiff is the reason why Defendant ever even learned of this unfortunate matter.  Granting summary judgment to Defendant as to Plaintiff's damages because Plaintiff did not disclose the immaterial, half-a-century old Court Marshall **would amount to rewarding Defendant for retaliating against Plaintiff because it is the only way Defendant learned of it in the first place.**  Defendant says it would have fired Plaintiff.  But, "[w]e better know there is a fire whence we see much smoke rising than we could know it by one or two witnesses swearing to it. The witnesses may commit perjury, but the smoke cannot." Hopkins v. Andaya, 958 F.2d 881, 888 (10th Cir. 1992) (quoting Abraham Lincoln).

Defendant is attempting to use the "killing someone" language to poison the Court's opinion of Plaintiff, like Dunkerley tried to poison HR's opinion of Plaintiff after he complained of Dunkerley's discrimination.

## CONCLUSION

The Defendant has failed to establish that it is entitled to summary judgment on Plaintiff's sole claim of retaliatory termination, as there are genuine issues of material fact and, viewing the evidence a light most favorable to the Plaintiff, there are triable issues concerning the Defendant's retaliatory intent.   As such, the Defendant's motion for summary judgment is due to be denied.

Respectfully Submitted,

/s/ Joshua A. Wrady_____
*Attorney for the Plaintiff*
Wrady & Michel, LLC
505 20th Street North, Suite 1650
Birmingham, AL 35203
Telephone: (205) 980-5700

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2017, I electronically filed the foregoing using the CM/ECF system, which will notify the following counsel of record:

Anne Knox Averitt
Anne R. Yuengert
Bradley Arant Boult Cummings, LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, Alabama  35203-2119

/s/ Joshua A. Wrady_____