# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| LOUIS W. JONES, SR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 2:16-cv-0400-SGC |
| ) | |
| UAB HEALTH SYSTEM, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

The court has before it the January 19, 2017 motion for summary judgment filed by Defendant UAB Health System ("UABHS"). (Doc. 19). Pursuant to the court's initial order and April 5, 2017 order, the motion is fully briefed and under submission as of April 17, 2017. (Docs. 18, 30). After consideration of the briefs and evidence, the motion is due to be granted in part and denied in part for the following reasons.

## I.  STATEMENT OF FACTS

Plaintiff, an African-American, began his employment with UABHS on January 3, 2013, as a systems analyst II on the staff of HealthQuest, part of the health system information services department. (Doc. 1 ¶ 17; Doc. 20-1 at 4).  The

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 13).

HealthQuest staff support the hospital patient management and billing system and report to Jeff Dunkerley, the information systems manager. (Doc. 20-13 at 2; *see* Doc. 21 at 3).

Plaintiff's first annual review covered the time period from his hire[2] through September 30, 2013. (Doc. 25-25). Dunkerley administered Plaintiff's first review in November 2013, and his remarks were generally positive. (*Id.*). Dunkerley rated Plaintiff as "met expectations" or "exceeded some expectations" in most areas and rated Plaintiff as "met some expectations" in the area of productivity, efficiency, and dependability. (*Id.* at 2-4). Dunkerley noted Plaintiff was "often late" which "has caused problems a few times" and suggested Plaintiff "could improve his overall results by prioritizing his work on a daily basis." (*Id.* at 2, 4). Dunkerley testified he gave new employees some leeway during the first year of employment to become familiar with the HealthQuest system and it typically took a year to become proficient. (Doc. 20-13 at 4).

Dunkerley expected HealthQuest employees to take more responsibility and work with less supervision after their first year. (Doc. 20-13 at 5). Plaintiff did not live up to Dunkerley's expectation after the first year, but instead his performance deteriorated. (*Id.*). For example, Plaintiff missed deadlines for projects, Dunkerley had to follow up with Plaintiff to complete assignments more than with

---

[2] The review states the period as October 1, 2012 through September 30, 2013, but Plaintiff was not hired until January 3, 2013.

other employees, and Dunkerley had to reassign some of Plaintiff's projects to get them completed on time. (*Id.*). Plaintiff disagreed with Dunkerley's assessment and testified Dunkerley scrutinized his work more closely and set unrealistic deadlines for his projects. (Doc. 25-15 at 2-10; Doc. 25-1 at 32, 36-37).

During his second year of employment, on August 25, 2014, Plaintiff submitted his first complaint about Dunkerley to Jeanie Singer in Human Resources and to various other administrators. (Doc. 25-16 at 2-3). Among other things, Plaintiff contended he was being singled out by Dunkerley and treated differently because of his race. (*Id.*). Dunkerley was immediately aware of the complaint. (Doc. 25-6 at 10; Doc. 25-17 at 2). Following the complaint, Dunkerley began sending emails to individuals in Human Resources regarding Plaintiff, including matters occurring before Plaintiff made his complaint and information about Plaintiff's punctuality. (Doc. 25-6 at 10-16). There is no evidence Dunkerley sent similar emails about other employees. There is also no evidence in the record of complaints by Dunkerley about Plaintiff before his August 25, 2014 complaint.

On October 3, 2014, Plaintiff took medical leave for wrist surgery. (Doc. 25-2 at 16). While on medical leave, on October 24, 2014, Plaintiff filed his first charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendant alleging discrimination on the basis of race. (Doc.

25-24).  Defendant, including Dunkerley, learned of Plaintiff's charge of discrimination while he was on medical leave.  (Doc. 25-6 at 18).  Plaintiff returned to work in late December.  (*Id*. at 26).

Because he was on medical leave during the annual review period, Dunkerley administered Plaintiff's second annual review when he returned.  (*Id*.).  This review was more critical of Plaintiff than the first review.  (Doc. 25-26).  Dunkerley rated Plaintiff as "met expectations" in the area of quality of work and "exceeded some expectations" in the area of communication but rated his work as "met some expectations" in most areas and "failed to meet expectations" in the area of productivity, efficiency, and dependability.  (*Id*. at 3-6).  Dunkerley specifically noted a number of project deficiencies, as well as problems working with the team.  (*Id*.).  Plaintiff disagreed with Dunkerley's assessment and testified he "for the most part" completed assignments on time and did not complete others because the deadlines were unrealistic or unworkable because the customer was still defining what it needed from the project. (Doc. 20-1 at 72-74).

After his review, Dunkerley continued to note problems with Plaintiff's work.  A few months later, on March 5, 2015, Dunkerley, his supervisor Melanie Turner, and Joan Wilson from Human Resources, had a telephone conference regarding Plaintiff.  (Doc. 25-6 at 21).  Wilson jotted handwritten notes from the call and transferred some of those notes to a typed document.  (Docs. 25-10 and

4

25-11). During that call, Dunkerley stated Plaintiff was sixty days into a ninety day performance plan. (Doc. 25-10). That statement was false, and Dunkerley admitted he never placed Plaintiff on a performance plan and could not explain why he stated he did. (Doc. 25-4 at 19). Dunkerley also stated Plaintiff's productivity was still deficient, but Dunkerley worried if the problems were presented to Plaintiff it was "his word against mine" and Plaintiff would respond Dunkerley was not adequately communicating with him. (Docs. 25-10 and 25-11). Dunkerley admitted he felt his "hands had been tied" but he could "take off the gloves" if necessary. (*Id*.).

Later that month, on March 23, 2015, Dunkerley sent an email to Singer and Wilson with a list of projects he reassigned from Plaintiff to other employees. (Doc. 25-32). Dunkerley stated he reassigned those projects "due to lack of progress." (*Id*. at 3).

### A. The April 14, 2015 security alert

Plaintiff had a project for patient management with a deadline on or about April 9, 2015. (Doc. 25-1 at 32-33). On April 8, 2015, Dunkerley sent an email to Plaintiff with questions regarding the outstanding project, noted the project was not near completion, and critiqued Plaintiff's work thus far on the project. (Doc. 20-7 at 235-36). Plaintiff responded to Dunkerley's concerns on the morning of

April 9, 2015, and told him that he would have the project completed by April 14, 2015. (*Id.*; Doc. 25-1 at 33; Doc. 20-13 at 9).

Less than an hour after responding to Dunkerley's concerns on April 9, Plaintiff sent an email with the subject line "Retaliation" to HR, detailing his allegations of retaliation since his return from medical leave. (Doc. 25-7). He also called the Ethics and Compliance Hotline at UABHS and made an identical complaint. (Doc. 20-6 at 49-50, 53-54).

On the afternoon of April 13, Plaintiff requested to move the patient management program file from the testing environment to production,[3] indicating the program was complete. (Doc. 20-13 at 9; Doc. 25-1 at 13-14). Dunkerley approved the move of the program. (Doc. 20-13 at 9). Several hours later, Dunkerley noticed the wrong version of the program file was moved, and he emailed Plaintiff about it. (*Id.*). When he did not hear back from Plaintiff, Dunkerley asked tech support to check the audit log in an attempt to locate the proper version of the file. (*Id.*). Tech support reported Plaintiff's user ID deleted the proper version from the testing environment. (*Id.*). Dunkerley assumed Plaintiff mistakenly deleted the correct version and it would have to be reloaded the following day. (*Id.*).

---

[3] System analysts worked on computer programs in a testing environment and quality assurance environment before the programs were complete. (Doc. 20-13 at 9).

As Plaintiff arrived at work the following morning,[4] April 14, 2015, but before he got to his desk, Dunkerley approached him and asked what had happened with the deletion of the program from the day before. (Doc. 25-1 at 14; Doc. 25-8 at 2; Doc. 25-34 at 2). Plaintiff responded he did not know and would look into it. (Doc. 25-1 at 14). Plaintiff then ran into Gary Slaten who stopped Plaintiff to talk to him about a problem in a program they were working on together. (*Id*. at 12, 14). After this conversation, Plaintiff arrived at his workstation and logged into his computer. (*Id*.). Slaten and Plaintiff worked the next few hours together on the problem with the program. (*Id*.).

At approximately 8:30 a.m., Jacky Partridge, a system administrator II, saw a security alert on his console showing at 8:17 a.m. user LWJONES was "TRYING TO REMOVE USER ID FROM TEST GROUP."[5] (Doc. 20-15 at 2; Doc. 25-9 at 3). The security alert was generated by the resource access control facility ("RACF"), the mainframe computer's security program. (Doc. 20-15 at 3). The alert met the definition of an inside security threat. (*Id*. at 2-3). Because Partridge had never seen this type of alert, he notified his supervisor, David Winningham, who also had never seen such an alert. (*Id*. at 3; Doc. 20-16 at 2).

---

[4] Plaintiff argues he arrived at work at 8:21:54 a.m. (Doc. 25-9 at 7-9). Defendant contends, however, Plaintiff arrived at work at 8:11:22 a.m. (Doc. 25-9 at 38). This question of fact is discussed in more detail later.
[5] The test group at issue was the group associated with the program deleted the day before. (Doc. 25-8 at 2).

Winningham in turn notified Dunkerley since the user ID in question was associated with one of his direct reports. (Doc. 20-16 at 3; Doc. 20-13 at 3). Dunkerley immediately consulted with Turner and Singer. (Doc. 20-13 at 3).

At approximately 10:00 a.m., Dunkerley and Turner met with Plaintiff, told him about the security alert associated with his user ID, and asked what he attempted to do in the system that morning. (*Id*.; Doc. 25-1 at 12). Plaintiff responded he had not touched the security system, he was working with Slaten all morning, and it was ludicrous to accuse him of such behavior. (Doc. 25-1 at 12; Doc. 20-13 at 3). Dunkerley and Turner suspended Plaintiff pending an investigation. (*Id*.).

### B. The investigation and Plaintiff's termination

Don Fast, the chief technology officer at UAB, was notified of the security alert by Dunkerley and Winningham. (Doc. 20-18 at 2). Fast asked John Bandy, who was then an information security architect, to conduct an investigation into the security alert. (*Id*.). Bandy's investigation included (1) an interview with Dunkerley about the issues with Plaintiff's program file on April 13 and his communications with Plaintiff on April 13 and 14, (2) a review of records of Plaintiff's user ID activity; (3) a review of still photos of the video footage and badge access from UAB security; and (4) information from Plaintiff about his computer activity the morning of April 14. (Doc. 20-20 at 6-24). Bandy

concluded the security alert was committed by Plaintiff's user ID at his desktop computer. (Doc. 25-9 at 4).

Bandy concluded Plaintiff entered the building around 8:11 a.m. on April 14. (Doc. 25-3 at 36-37). The computer activity logs showed Plaintiff's user ID logged into the computer system at 8:13:19 a.m., and an attempt to remove a user ID from the test group was performed with Plaintiff's user ID from Plaintiff's workstation at 8:17:48 a.m. (Doc. 25-9 at 11, 12; Doc. 25-3 at 36). When Bandy spoke to Plaintiff, he stated he did not attempt to remove his user ID from the test group. (Doc. 20-20 at 18-22). Plaintiff maintained there was no reason he would want to remove his user ID from the test group, he did not know how to commit the alleged violation, and he did not think he was in the office at the time the security alert occurred. (Doc. 25-9 at 15-18). Bandy opined potential reasons Plaintiff would attempt to remove his user ID, including an attempt to show he could not delete the code Dunkerley accused him of deleting the day before, a test of the security system to see what privileges were available to that user ID, or a precursor to a potentially more serious change to the security system. (*Id*. at 5).

Bandy wrote multiple drafts of his report and received input from Dunkerley, Winningham, and Fast. (Doc. 20-18 at 3; Doc. 25-35 at 2-5). Fast approved the final version of the report and sent it to Dunkerley, Turner, Singer and Joan Hicks from Human Resources. (Doc. 25-9; Doc. 20-18 at 3). Fast

expressed his opinion that Bandy's report revealed Plaintiff committed a serious security violation warranting termination. (*Id.*). Dunkerley and Turner agreed they could not trust Plaintiff with access to UABHS records and made the decision to terminate Plaintiff. (Doc. 20-13 at 4; Doc. 20-14 at 5).

On April 22, 2015, Defendant terminated Plaintiff. (Doc. 25-8 at 2-3). Dunkerley sent a termination letter to Plaintiff detailing the reasons for his termination. (*Id.*). The letter stated it was "concluded that you had tried to remove your user ID" causing a security alert. (*Id.* at 3). The letter ended "[a]fter consideration of the events and investigation results, we have decided to terminate your employment." (*Id.*).

Plaintiff filed a charge of discrimination with the EEOC on June 15, 2015. (Doc. 1-1 at 3-4). In his charge, Plaintiff contended he was retaliated against by Dunkerley after he filed his first charge of discrimination. (*Id.*). The EEOC dismissed Plaintiff's charge on December 7, 2015, and Plaintiff timely filed his complaint on March 8, 2016. (*Id.* at 1; Doc. 1).

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

### III. DISCUSSION

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3(a). "The goal of this provision is to "prevent[ ] an

employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Taylor v. Teakdecking Sys.*, Inc., 571 F. App'x. 767, 771 (11th Cir. 2014).

Where proof of retaliatory intent is offered by way of circumstantial evidence, as here, courts apply a burden-shifting scheme analogous to the *McDonnell Douglas* framework. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997); *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1162-3 (11th Cir. 1994). The *McDonnell Douglas* framework is not the only way for a plaintiff to survive summary judgment in a discrimination or retaliation case. *Sims v. MVM, Inc.,* 704 F.3d 1327, 1332–1333 (11th Cir. 2013); *Smith v. Lockheed–Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, "[t]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory [or retaliatory] intent." *Smith*, 344 F.3d at 1328. A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional retaliation by the decision maker. *Id.; see generally Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).

## A. Genuine issues of material fact remain

Clear questions of material fact remain in this case. Plaintiff presented evidence of interference from Dunkerley throughout Bandy's investigation and in his drafting of the report. Bandy testified he spoke with Dunkerley throughout his investigation, and Bandy relied on him to explain many of his questions. (Doc. 25-3 at 8, 26-27, 32). For example, Bandy relied on Dunkerley to explain the discrepancies in the active directory report showing log on and log off events, as well as the card access report showing when a person entered and left the building. (Doc. 25-9 at 12, 38). The active directory report for April 13, 2015, the day before the security alert, showed someone used Plaintiff's user ID to log in at 7:00:02 a.m. and then log off at 8:27:09 a.m. (Doc. 25-9 at 12). However, the card access report from that day shows Plaintiff entered the building at 8:31:57 a.m. (*Id*. at 38). When asked in his deposition about these reports and the discrepancies, Bandy first stated the active directory report showed the log in was from Plaintiff's work computer but then stated Dunkerley told him Plaintiff had access to work from home and could log in remotely. (Doc. 25-3 at 57-58). Based on this information from Dunkerley, Bandy assumed Plaintiff was working from home when his user ID was used earlier the morning of April 13. (*Id*.). Bandy did not separately investigate Dunkerley's statement but relied on it in making his conclusions. (*Id*.).

Additionally, the day he started the investigation, and only a few hours after the security alert, Bandy sent an email to Winnginham and Dunkerley attaching an initial draft of the report. (Doc. 25-35 at 2). The email asked them to "verify this is what happened and is on the right date and time frame." (*Id.*). The attached draft already contained a summary of events and conclusion of Plaintiff's guilt in creating the security alert. (*Id.* at 4-5).

If Dunkerley knew Plaintiff was either (a) not at work when the security violation occurred and/or (b) not logged into his computer, Dunkerley's involvement in the investigation and input in the drafting of the report potentially taints the results of the investigation. This evidence could allow a reasonable jury to conclude Dunkerley manipulated Bandy and the investigation toward a certain outcome and Dunkerley knew Plaintiff did not commit the security violation but still terminated him.

For these reasons, the court concludes a triable issue of fact exists. The record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional retaliation by Dunkerley. *See Smith*, 344 F.3d at 1328. Dunkerley knew of Plaintiff's protected activity, the last of which occurred five days before Plaintiff's suspension and eventual termination for the security breach. Additionally, Plaintiff presented evidence of Dunkerley's increased scrutiny of his work and increased

frustration[6] with Plaintiff as time passed. Further, Plaintiff presented evidence, which if believed, could establish Defendant's reason for his termination was false, and Dunkerley knew or should have known it was false. All of this evidence, taken in combination, could allow a reasonable juror to conclude Plaintiff was fired in retaliation for his complaints of race discrimination.

### B. After-Acquired evidence caps plaintiff's potential recovery

On September 30, 2016, Plaintiff testified he was dishonorably discharged from the Army and served five years in the stockade for killing someone in a bar fight. (Doc. 20-2 at 13). On Plaintiff's job application, he represented he had never been "convicted of any crime(s) (felony or misdemeanor including DUI) other than a routine traffic citation(s)." (Doc. 20-17 at 9). UABHS maintains that if it had discovered this misrepresentation in his application before his employment, it would not have hired him, or it would have terminated his employment immediately upon discovering it during his employment. (Doc. 20-17 at 5).

Plaintiff contends he did not misrepresent anything on his application because a court martial is not a "conviction" and the Uniform Code of Military Justice is not civilian, criminal law. The court disagrees. Case law is clear the Uniform Code of Military Justice "is a law of the United States and has the force

---

[6] Dunkerly admitted he lied to his supervisor and a member of HR regarding placing Plaintiff on a performance plan and stated he was ready to "take the gloves off" with respect to Plaintiff.

and effect of federal statutes." *Esters v. State*, 480 So. 2d 615, 617-18 (Ala. Crim. App. 1985) (rejecting appellant's argument that a military conviction did not equate to a prior felony conviction); *see also Scott v. United States*, 392 A.2d 4, 8 (D.C. Cir. 1978) ("it would be nonsensical to hold, for example, that the military equivalents of murder or armed robbery would be exempt for use to increase a sentence").

A plaintiff's recovery is capped where the after-acquired evidence would have led to the plaintiff's immediate dismissal. *Wallace v. Dunn Constr. Co., Inc*., 62 F.3d 374, 380 (11th Cir. 1995). UABHS asked Plaintiff about any prior criminal convictions, felony or misdemeanor, and he disclosed none. The undisputed evidence establishes if UABHS had discovered this misrepresentation, it would not have hired him or would have terminated his employment for the misrepresentation. Therefore, the after-acquired evidence rule bars Plaintiff's front pay recovery and caps Plaintiff's back pay recovery as of his September 30, 2016 deposition.

## IV. CONCLUSION

For the foregoing reasons, the motion for summary judgment (Doc. 19) is **GRANTED IN PART** and **DENIED IN PART**. Defendant's motion is **DENIED** as to Plaintiff's retaliation claim. Defendant's motion is **GRANTED** regarding

Plaintiff's damages. Plaintiff's front pay damages are barred and his back pay damages are capped as of September 30, 2016.

**DONE** and **ORDERED** this 15th day of February, 2018.

*/s/ Staci G. Cornelius*
STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE